IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division



FILED
IN OPEN COURT

SEP 28 2016

| UNITED STATES OF AMERICA | |
|---|---|
| v. | Criminal No. 1:16-cr-140 |
| PETER ROMAR, (a/k/a "PIERRE ROMAR"), | The Hon. Claude M. Hilton |
| Defendant. | |

## STATEMENT OF FACTS

The United States and the defendant, PETER ROMAR, agree that the following facts are true and correct, and that had this matter proceeded to trial, the United States would have proven them beyond a reasonable doubt with admissible and credible evidence:

1. ROMAR was a Syrian national who, at the time of his extradition in this case, lawfully resided in Germany.

2. From at least March 2013 into 2014, ROMAR knew of the Syrian hacking group known as the "Syrian Electronic Army" ("SEA"); learned of the SEA's activities through its social media accounts; offered to help the SEA; and had communications with members of the SEA.

3. The SEA was a group that, beginning in at least fall 2011, was involved in a number of well-publicized and unauthorized computer intrusions in support of the Syrian Government and Syrian president Bashar al-Assad. From approximately 2013 to 2014, members of the SEA also conducted a cyberextortion scheme that targeted companies in the United States and abroad. The scheme generally involved obtaining the login credentials of victim employees through spearphishing, using the stolen credentials to gain unauthorized access to protected

computers, stealing valuable information, conducting defacements, and disabling services. The conspirators would thereafter threaten to disclose or sell the stolen information to third parties or disable additional services should the victim decline to pay a ransom.

4. Over several weeks in or about April 2013, ROMAR engaged SEA leader Ahmad 'Umar Agha (also known as "The Pro") in a series of communications about hacking activities. The Pro placed ROMAR in contact with SEA member Firas Dardar, also known by his online pseudonym "The Shadow." Thereafter, ROMAR and The Shadow, who was located in Syria, communicated directly.

### *Participation in Conspiracy*

5. In or around October 2013, The Shadow gained unauthorized access to the computer systems of a victim company based in Cyprus. On or about October 29, 2013, The Shadow sent an email to the victim company that stated he had "hacked" the company's website servers and databases, and demanded payment in exchange for refraining from selling the company's information to others. He provided proof of the hack and indicated that he had two buyers who would each pay €150,000 for the information, but stated that he would not sell it to these buyers in exchange for €300,000 from the victim company. He gave the victim 24 hours to respond.

6. On or about November 20, 2013, ROMAR agreed with The Shadow to ask his German bank whether it would transfer money from Germany to Syria. Within a week, ROMAR told The Shadow that while German banks were no longer transferring money to Syria, Western Union was making such transfers.

7. On or about November 27, 2013, The Shadow gained unauthorized access to the computer systems of a victim company based in California. Later that day, The Shadow sent an

email to several of the victim's employees stating: "[I] hacked your website servers and databases and i downloaded it all." The Shadow further demanded money to avoid future intrusions into the victim's servers. Receiving no immediate response from the victim, later that day The Shadow compromised the company's domain registration account and redirected the victim's website to a site that stated, "HACKED." The next day, the victim company contacted The Shadow about, among other things, paying the demanded ransom.

8. On or about December 15, 2013, The Shadow requested ROMAR's assistance in transferring a total of €16,000 from Cyprus and the United States to Syria, via ROMAR's bank in Germany. ROMAR informed The Shadow that because bank transfers from Germany to Syria were not possible due to sanctions, they would have to find an alternative means of transfer. ROMAR agreed to receive the money on The Shadow's behalf from the two victim companies in Cyprus and the United States, referenced above in Paragraphs 5 and 7, and to transfer the funds to The Shadow via Western Union.

9. During the December 15, 2013 communications, The Shadow informed ROMAR that he had "hacked" the Cypriot company described in Paragraph 5 above, and that if his victim companies did not send payment he would "declare a war on them." In return for ROMAR's assistance, The Shadow offered ROMAR a €1000 payment. ROMAR did not accept this €1000 payment.

10. On or about December 25, 2013, The Shadow instructed ROMAR to transmit any payment ROMAR received from the U.S. company described in Paragraph 7 above, to Tamar Agha. Two days later, ROMAR received a Western Union transfer of $1,500 from said U.S. company (approximately equal to €1,039). ROMAR then transferred €935, which represented

the entire amount received minus banking/money transfer fees, to a contact in Lebanon to facilitate the transfer to the conspirators in Syria.

11. In or around July 2014, The Shadow gained unauthorized access to the computer systems of a victim company based in Europe. On or about July 26, 2014, The Shadow sent an email to employees of this victim company that stated he had "hacked" the company's database, and demanded money in exchange for helping the company avoid future attacks. The following day, when the victim company agreed to pay €5000, The Shadow instructed the company to send the money to his "partner," ROMAR. On or about July 28, 2014, ROMAR received in his PayPal account €5000 from the victim company, which ROMAR later transferred to his bank account in Germany. ROMAR then transferred all of this money, minus administrative fees, to The Shadow.

12. In 2014, the Shadow transmitted extortionate communications to additional victims other than those victim companies described above, and ROMAR agreed with The Shadow to receive, on The Shadow's behalf, additional payments from victim companies other than those described above.

13. In undertaking the conduct described above in Paragraphs 6, 8, and 10 through 12, ROMAR deliberately or intentionally closed his eyes to what would otherwise have been obvious to him, namely, that the payments he received on The Shadow's behalf from victim companies were unlawfully obtained by extortion enabled through the conspiracy having gained unauthorized access to victim computers. ROMAR's deliberate or intentional ignorance, or deliberate or intentional blindness, to the existence of these facts is sufficient to prove beyond a reasonable doubt that ROMAR acted knowingly.

\* \* \*

14. The Statement of Facts includes those facts necessary to support the defendant's guilty plea. It does not include each and every fact known to the defendant or to the government, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

15. The actions of the defendant, as recounted above, were in all respects knowing, voluntary, and intentional, and were not committed by mistake, accident or other innocent reason.

16. If the defendant breaches the plea agreement, then pursuant to the plea agreement, he waives any rights under Federal Rule of Criminal Procedure 11(f), Federal Rule of Evidence 410, the United States Constitution, and any federal statute or rule in objecting to the admissibility of the statement of facts in any such proceeding.

Dana J. Boente
United States Attorney

By: *[signature]*

Brandon Van Grack
Special Assistant United States Attorney

Maya D. Song
Jay V. Prabhu
Assistant United States Attorneys

Scott K. McCulloch
Nathan M.F. Charles
Trial Attorneys, U.S. Department of Justice
National Security Division
Counterintelligence and Export Control Section

**Defendant's Signature**: After consulting with my attorney, I hereby stipulate that the above Statement of Facts is true and accurate and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt

Date: 16·09·16

Peter ROMAR
Defendant

**Defense Counsel Signature**: I am the defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one

Date: 9/27/16

Geremy C. Kamens, Esq.
Counsel for the Defendant